**UNITED STATES of America**

v.

**Robert JACKSON, William Scott, and Martin Allen, Defendants.**

**No. 76CR436.**

United States District Court,
E. D. New York.

Sept. 22, 1976.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., Richard Appleby, Asst. U. S. Atty., Brooklyn, N. Y., of counsel for the United States.

Legal Aid Society, Brooklyn, N. Y., for defendant Robert Jackson, Federal Defenders Unit.

Robert J. Riordan, Brooklyn, N. Y., for defendant William Scott.

## MEMORANDUM OF DECISION

MISHLER, Chief Judge.

Defendants are charged as follows:

*COUNT ONE* Conspiracy between June 11, 1976 and June 21, 1976, to commit armed bank robbery of the Manufacturers Hanover Trust Company, 210 Flushing Avenue, Brooklyn, New York (18 U.S.C. § 371);

*COUNT TWO* Attempted armed bank robbery on June 14, 1976 (18 U.S.C. § 2113(a) );

*COUNT THREE* Attempted armed bank robbery on June 21, 1976 (18 U.S.C. § 2113(a) );

*COUNT FOUR* Possession of unregistered sawed-off shotguns (26 U.S.C. § 5861(d) ).

Trial was to the court without a jury. The court finds:

On June 11, 1976, Vanessa Hodges, an unindicted co-conspirator, met Martin Allen through Rea Longhorne, the other unindicted co-conspirator named in Count One. She invited him to join her in a plan for the robbery of a branch of the Manufacturers Hanover Trust Company, located at 210 Flushing Avenue, in Brooklyn. Hodges proposed that the bank be robbed the next Monday, June 14th, at about 7:30 A.M., with the week-end deposits as the target. The scheme contemplated entering the bank at that hour as the manager opened the door of the bank. Allen accepted the invitation, and offered a sawed-off shotgun and .38 caliber pistol for use in the robbery. The next Monday morning at about 7:30 A.M., Allen met with Hodges. They entered a car driven by defendant Robert Jackson. A suitcase in the back seat contained a sawed-off shotgun, shells, material intended as masks, and handcuffs. They arrived at the bank after 8:00 A.M. It was too late to put into operation the first important step in the plan, i. e., entering the bank as the manager opened the door. They retired to a nearby restaurant for food and a pause to reflect on the attendant problems. The group returned to the bank at about 9:00 A.M.; Hodges and Allen exited the car. They observed the bulky night deposits and decided it was too risky to attempt the robbery without another hand. Defendants and Hodges went to the Coney Island section of Brooklyn to seek out defendant William Scott. They found him, and he joined the group after being told of the plan. Allen obtained another sawed-off shotgun. Defendants and Hodges returned to the bank. Scott entered the bank on the pretext of filling out an application for a credit card. He noticed the tellers were separating the night deposits, and that a number of patrons were now in the bank. Scott noted that the bank had a single surveillance camera over the entrance door. In the meantime, Jackson had placed a piece of cardboard with a false license number over the license plate of the car. When Scott reported his observations to his confederates, they decided to abandon the plans for the robbery that day, and resched-uled it for Monday, June 21st, at 7:30 A.M. It was then about 1:30 P.M. The group returned to Coney Island. In preparation for the robbery, they purchased a pair of stockings for Hodges to wear over her head as a disguise and gloves for Hodges, Scott and Allen.

Hodges was arrested on Friday, June 18th, on an unrelated bank robbery charge. She told the arresting agents of the bank robbery planned for the next Monday. F.B.I. agents surveilled the bank on June 21st beginning at 7:00 A.M.

Defendants arrived in the area of the bank at about 7:00 A.M. on June 21st, in the brown Lincoln sedan. It drove past the bank in an easterly direction, circled the block, and then parked at a fire hydrant on Washington Avenue, south of Flushing Avenue. (The bank is located on the southeast corner of Washington Avenue and Flushing Avenue.) Scott exited the vehicle and walked to the corner. He looked into the bank. He then returned to the vehicle. The vehicle then turned left on Flushing Avenue and proceeded in a westerly direction; it made a U-turn and stopped on the southerly side of Flushing Avenue, between Washington Avenue and Waverly Avenue (west of the bank). Thereafter, it proceeded in an easterly direction, past the bank again for two blocks, and turned south on Grand Avenue, where it came to a stop. Jackson got out of the car. The vehicle returned to its previous position on Flushing Avenue, between Washington Avenue and Waverly Avenue, where it remained for about thirty minutes. Defendants, suspecting that they were under surveillance, decided to abandon their plans and leave the area. The vehicle proceeded at an accelerated rate of speed easterly on Flushing Avenue, then southerly on Grand Avenue where they were overtaken by arresting officers. The officers seized a suitcase containing the sawed-off shotguns. One shotgun had an overall length of 24 inches with a barrel length of 14 inches; the other had an overall length of 27 inches and a barrel length of 15 inches. Each gun was loaded with three rounds. Six additional rounds were seized.

■ I find the defendants, Robert Jackson, William Scott and Martin Allen, guilty as to Counts One and Four. The evidence against defendants on these counts was overwhelming. As to Counts Two and Three, I also find the defendants guilty. Counts Two and Three, however, involve the elusive question of what constitutes an attempt under federal law. Here, the issue of whether defendants had attempted a robbery or were merely engaged in preparation was a close one.

Analysis must begin with the acknowledgement that "attempt" as used in § 2113(a), is not defined. In fact, "there is no comprehensive statutory definition of attempt in federal law." *United States v. Heng Awkak Roman,* 356 F.Supp. 434, 437 (S.D.N.Y.), *aff'd,* 484 F.2d 1271 (2d Cir. 1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974). Definitions of attempt appear to accrue in direct relation to the number of decisions written on the subject. It is necessary to decide on a formulation of what constitutes an attempt that will distinguish the crime from that of conspiracy as well as justify the heavier penalties that may be imposed when such an offense is committed.[1]

In *United States v. Coplon,* 185 F.2d 629 (2d Cir. 1950), *cert. denied,* 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952), the defendant was convicted of an attempt to deliver classified government documents to a foreign citizen. Although the defendant was arrested before the documents had been proferred to the foreign national—or indeed even before the defendant had removed them from her purse—the Second Circuit affirmed the conviction, rejecting the doctrine that an attempt could not occur unless the defendant had done all that he could to commit the crime, "but has been prevented by intervention from outside." *Id.* at 633. Judge Learned Hand observed that, although this doctrine may once have been followed,

it is certainly not now generally the law in the United States, for there are many decisions which hold that the accused has passed beyond "preparation," although he has been interrupted before he has taken the last of his intended steps.

Quoting from Justice Holmes' opinion in *Commonwealth v. Peaslee,* 177 Mass. 267, 272, 59 N.E. 55, 56 (1901), Judge Hand went on to state:

"Preparation is not an attempt. But some preparations may amount to an attempt. It is a question of degree. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a misdemeanor, although there is still a locus poenitentiae, in the need of a further exertion of the will to complete the crime." We have found scarcely any decisions of federal courts, but, so far as they go, they are in accord. There can be no doubt in the case at bar that "preparation" had become "attempt." The jury were free to find that the packet was to be delivered that night, as soon as they both thought it safe to do so. To divide "attempt" from "preparation" by the very instant of consummation would be to revert to the old doctrine.

185 F.2d at 633 (footnotes omitted).

*Accord, United States v. Noreikis,* 481 F.2d 1177, 1182 (7th Cir. 1973); *vacated and remanded on other grounds,* 415 U.S. 904, 94 S.Ct. 1398, 39 L.Ed.2d 461 (1974); *United States v. Butler,* 204 F.Supp. 339, 343–44 (S.D.N.Y.1962).

■ More recently, two circuit courts of appeal adopted a dual-pronged standard to determine what conduct constitutes a criminal attempt. After a lengthy discussion of case law on attempts, the Fifth Circuit, in *United States v. Mandujano,* 499 F.2d 370 (5th Cir. 1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), distilled from "varying verbal formulations" the following definition:

---

1. Under § 2113(a), a defendant convicted of attempted bank robbery can be sentenced to a maximum of 20 years. By contrast, a conspir-

acy conviction under 18 U.S.C. § 371 carries a maximum penalty of five years imprisonment.

First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting.

. . . . .

Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.

*Id.* at 376. *Accord, United States v. Green,* 511 F.2d 1062 (7th Cir. 1975). *See United States v. Oviedo,* 525 F.2d 881 (5th Cir. 1976); *United States v. Bussey,* 507 F.2d 1096 (9th Cir. 1974); *Mims v. United States,* 375 F.2d 135 (5th Cir. 1967). This standard rejects any requirement that the defendant neared completion of the crime or that his behavior substantially encompassed all the elements of the crime although in the end the attempt was unsuccessful. As the Supreme Court observed in an early opinion, "[t]o attempt to do an act does not imply a completion of the act, or in fact any definite progress towards it. Any effort or endeavor to effect the act will satisfy the terms of the law." *United States v. Quin-cy,* 6 Pet. 445, 31 U.S. 445, 8 L.Ed. 458 (1832). *Accord, United States v. Robles,* 185 F.Supp. 82, 85 (N.D.Cal.1960); Mathes & Devitt, Federal Jury Practice and Instructions (1965). Thus, the essence of the crime is criminal purpose effected by overt acts that corroborate the seriousness of the defendant's criminal intent. This formulation thereby

shifts the emphasis from what remains to be done—the chief concern of the proximity tests—to what the action *has already done.* The fact that further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial.

Model Penal Code, § 5.01, Comments at 47 (Tentative Draft No. 10, 1960).[2] Furthermore, a conviction for attempt, with its attendant heavy penalties, is justified when the defendant has manifested "a certain dangerousness," *United States v. Butler, supra* at 344, without necessarily committing the intended crime, or even a dangerous act, *i. e.,* shooting at a person but missing the mark. It is enough that the gun was purchased and the would-be assailant wait-

---

**2.** The *Mandujano* formulation essentially tracks the American Law Institute's Model Penal Code. Section 5.01 of the Code reads in pertinent part:

(1) *Definition of Attempt.* A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

(b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or

(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

(2) *Conduct Which May Be Held Substantial Step Under Subsection (1)(c).* Conduct shall not be held to constitute a substantial step under Subsection (1)(c) of this Section unless it is strongly corroborative of the actor's criminal purpose.

Model Penal Code, § 5.01 (Proposed Official Draft 1962). The proposed amendments to the Federal Criminal Code would enact the following definition:

§ 1001. *Criminal Attempt.*

(a) OFFENSE—A person is guilty of an offense if, acting with the state of mind required for the commission of a crime, he intentionally engages in conduct that, in fact, amounts to more than mere preparation for, and *that* indicates his intent to complete, the commission of the crime.

S. 1, 94th Cong. 1st Sess. § 1001 (1975). According to the Senate Report accompanying S. 1, this definition is similar to that adopted in *United States v. Mandujano, supra:*

The offense as drafted here contains two essential elements: a person must (1) intentionally engage in conduct, acting otherwise with the state of mind required for the commission of a crime, and (2) the conduct must amount to more than mere preparation for, and indicate his intent to complete, the commission of the crime.

Report of the Committee on the Judiciary United States Senate to Accompany S. 1, Report No. 94–00, 94th Cong. 1st Sess. 171 & n.20 (1975).

ed in ambush with the loaded weapon fixed on the victim.[3]

Turning to the question of attempt under § 2113(a), I think the *Mandujano* standard serves the Congressional purpose in enacting this provision. Section 2113(a) provides in relevant part:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank . . . or

Whoever enters or attempts to enter any bank . . . with intent to commit in such bank . . . any felony affecting such bank . . . and in violation of any statute of the United States, or any larceny—

Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

The statute is obviously designed to deter conduct that involves acts leading to actual bank robbery, although the robbery does not take place. *See Prince v. United States,* 352 U.S. 322, 328, 77 S.Ct. 403, 407, 1 L.Ed.2d 370 (1957). Indeed, to convict under this statute for attempted robbery it is not necessary to establish that an actual entry into the bank had been made by the accused. *See Rumfelt v. United States,* 445 F.2d 134 (7th Cir.), *cert. denied,* 405 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 94 (1971).

In the final analysis, of course, the question of whether an attempted bank robbery has been committed is one of degree. The answer will vary in each case, depending on the intent of the defendant, the "substantial steps" taken to effect that intent, and the defendant's manifestation of dangerousness.[4]

In the present case, the defendants intended to commit an armed bank robbery, first on June 14, and then on June 21. The critical question is whether the defendants took substantial steps, corroborative of their intent, toward the commission of the crime. On June 14, the defendants, already agreed on a robbery plan, drove to the bank. Their car was loaded with armed weapons. In order to carry the night deposit sacks, another individual was recruited. Cardboard was placed over the license, and Scott entered the bank to reconnoiter. By any measure, substantial steps had been taken to carry out the robbery plan.[5] An

---

3. *See People v. Sullivan,* 173 N.Y. 122, 135–36, 65 N.E. 989 (1903). In that case defendants were convicted of murder while attempting to commit a robbery. The defendants, armed with chisels, had been proceeding toward a post office they intended to rob when they encountered a police officer. Shots were fired and the officer was killed. On appeal, the defendants argued that they had not committed the crime of attempted robbery, the offense underlying their felony murder conviction. The court rejected this contention, stating that

if the jury believed that the defendant and his associates were at the post office reconnoitering or inspecting it with the intent to break it open, and that they would have done so had their design not been frustrated by the presence or interference of the deceased, the police officer, then I think it could properly find that they were engaged in an attempt to commit burglary.

*Id.* at 135, 65 N.E. at 993. *See People v. Collins,* 234 N.Y. 355, 137 N.E. 753 (1922). *Compare People v. Rizzo,* 246 N.Y. 334, 158 N.E. 888 (1927) *with People v. Gormley,* 222 App. Div. 256, 225 N.Y.S. 653 (1927), *aff'd w'o opinion,* 248 N.Y. 583, 162 N.E. 533 (1928).

4. Two elements distinguish the *Mandujano* definition of attempt from the crime of conspiracy. First, proof of "substantial steps" is required to convict for attempt, while a single overt act will support a conspiracy conviction. Second, the essence of a conspiracy is the agreement to commit a crime. *See United States v. Rabinowich,* 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915). If an overt act is committed in furtherance of the conspiracy then, regardless of the act's importance to the overall scheme, there is no need to prove that the conspirators made a serious effort to carry out their agreement. An attempt, however, involves a significant manifestation of dangerousness on the part of actors who have taken substantial steps to effect their illegal purpose.

5. The Model Penal Code suggests that the following conduct qualifies as "substantial steps":

Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:

(a) lying in wait, searching for or following the contemplated victim of the crime;

armed assault on the bank would have been the next act if fewer bank patrons had been present. These men were seriously dedicated to the commission of a crime; their conduct had passed beyond the stage of preparation to a point where society has an interest in intervening in order to punish and deter.

On June 21, essentially the same acts were done by defendants. Since the bank already had been checked for the location of television cameras, there was no need to enter for surveillance. Indeed, since defendants had arrived at 7:00 A.M., the conditions were more favorable to the robbery plan that day than on the 14th. The next step would have been an assault on the bank as the manager opened the door at 7:30 A.M. Only the presence of the F.B.I. agents thwarted the defendants. Here, as on the 14th, the defendants took substantial steps that affirmed their criminal intentions and manifested sufficient dangerousness to justify a conviction for attempt.

In sum, I find the defendants guilty as charged in Counts One through Four.

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; ·

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

Model Penal Code § 5.01 (Proposed Official Draft 1962). *Accord,* Report of the Committee on the Judiciary United States Senate to Accompany S. 1, Report No. 94–00, 94th Cong. 1st Sess. 172 (1975).